MAUCK, ET AL. *v.* WALTER BAILEY, ADMINIS- TRATOR OF THE ESTATE OF EMMA O. LESTER

[No. 485, September Term, 1966.]

*Decided July 13, 1967.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, OPPENHEIMER, BARNES and FINAN, JJ.

*W. Byron Sorrell* for appellants.

*Douglas F. Lyons* and *Joseph J. Malloy* for appellee.

BARNES, J., delivered the opinion of the Court.

The principal question raised by this appeal is the sufficiency of the evidence to support the finding in the decree of the Circuit Court for Anne Arundel County (Sachse, J.) that the appellee's decedent, Emma O. Lester, the plaintiff below, had acquired title by adverse possession to a tract of land in Deale Beach in the Seventh Election District of Anne Arundel County. The suit was filed on February 14, 1963, by Mrs. Lester against the appellants Herman E. Mauck, and Ethel V. Mauck, his wife, the owners of lots near the disputed property and a claimant of the disputed property, alleging, *inter alia*, that the Maucks tore down the fence which had been erected by Mrs. Lester in 1939 and had erected another fence across a roadway used by Mrs. Lester as a means of ingress and egress to her property for over 20 years. The plaintiff prayed that the Maucks be enjoined from continuing the fence on the disputed land and for other relief.

John J. Gormley, on behalf of himself and other residents and property owners in Deale Beach similarly situated, prayed leave to intervene on March 18, 1963, as a party defendant, alleging that the disputed property involved a portion of Chesapeake Drive in Deale Beach and the intervenor and other residents and property owners similarly situated had a direct interest in the outcome of the suit because it could deprive them of the use of Chesapeake Drive as an access to the waters of Chesapeake Bay. Leave to intervene was granted by the Chancellor on April 25, 1963.

The intervenor filed a counter bill of complaint on May 8, 1963, alleging that the plaintiff and cross defendant, Mrs. Lester, had encroached upon a public right-of-way by a dwelling house and other constructions and prayed that the court direct a survey, issue a mandatory injunction to compel removal of the encroachments, issue a negative injunction prohibiting encroachment or obstruction by Mrs. Lester on Chesapeake Drive, require Mrs. Lester to pay the costs of survey and removal of encroachments and grant other relief.

After the suit was at issue on the pleadings, a considerable amount of testimony was taken. The evidence showed that The Bay Beach Realty Company had subdivided a number of acres in Anne Arundel County in 1935 into a number of lots with

frontages of approximately 25 feet. The development was called Deale Beach and was bounded on the north and northwest by Carr's Creek. On the south, southeast and east part of the land is bounded by the Chesapeake Bay. A plat of the subdivision was recorded among the Land Records of Anne Arundel County.

Various streets are shown on the plat. Main Street, 40 feet wide, which runs approximately in an east-west direction ultimately connects with Sixth Street which runs in a north-south direction to the Chesapeake Bay. Chesapeake Drive, 25 feet wide, begins on the east side of Sixth Street approximately 100 feet south of the intersection of Main Street and Sixth Street. It runs approximately due east for one-half of its distance and then in a south-easterly direction ending at the Chesapeake Bay. The last six lots on the southerly side of Chesapeake Drive are lots 45, 46, 47, 48, 49 and 50, in Block L on the plat. These lots were purchased by Mrs. Lester from the developer on September 8, 1938. The deed of that date, duly recorded among the Land Records of Anne Arundel County, described the six lots by number and block by reference to the plat and contained eight restrictive covenants, running with the land. The first and third restrictions provide:

> "1. All dwellings shall be set back from the street upon which the premises front not less than 25 feet, and all garages shall be set back not less than 70 feet, and garages on corner lots shall be set back not less than 20 feet from the side street, and no dwelling shall be built on a plot having a frontage of less than 40 feet on the street on which the plot fronts, and no dwelling shall be built on a corner lot having a frontage of less than 60 feet on the street on which the plot fronts and such dwelling shall be set back not less than 20 feet from the side street, and no dwelling shall cost less than $500.00.
>
> \* \* \*
>
> "3. No fence, wall or hedge shall be built or maintained unless the location, nature, shape and material be first made known to the grantor in said deed or its successors, and receive its or their approval in writing."

On the northerly side of Chesapeake Drive was an area marked "Reserved" on the plat, which extends approximately 230 feet westerly from the Chesapeake Bay to the easterly line of Lot 5 in Block M and then runs in a northerly direction along the easterly line of Lot 5 to an area marked "Sand Bar Reserved." The line of the reserved area then proceeds in a southeasterly direction to its beginning at the intersection of the northerly side of Chesapeake Drive and the Chesapeake Bay.

The Maucks purchased Lots 1, 2, 3, 4 and 5 in Block M in 1950. As indicated, Lot 5 immediately adjoins the area marked "Reserved." On June 24, 1961, the Maucks purchased from The Bay Beach Realty Company a portion of the "Reserved" area which included the portion of that area claimed by Mrs. Lester.

The evidence introduced on behalf of Mrs. Lester indicated that when her home was built in 1939, a corner of the house was built upon the 25 foot right-of-way of Chesapeake Drive, extending into that right-of-way approximately four feet. A well was dug in the right-of-way and on part of the reserved area approximately 23 feet north of the northerly line of Lot 50. The well cover is 5.6 feet by 4.5 feet. Mrs. Lester used an eight foot road partly on the 25 foot right-of-way and partly on the reserved area in 1939 in which there was a gate at the eight foot road. The gate was kept padlocked.

Raymond Leon Fischer, who from time to time did work on Mrs. Lester's property, first saw the property on October 16, 1939. At that time the fence was completely built, extending around the entire property in order to keep the dogs from getting out. The fence came around behind the well about four feet and extended about twelve feet beyond the well. In 1956, the fence was removed by a storm and was replaced by the witness and remained in place until it was removed by the Maucks. There was a roadway made of gravel and shells raised above the surrounding marsh when he first went to the property. This was the eight foot roadway shown on plaintiff's Exhibit 3. The witness also identified three photographs showing the fence and roadway.

Clayson Simmons, who built the house for Mrs. Lester, and who had resided in the area all of his life, testified that after he had completed the house, he visited the property almost every

year. The eight foot road had been on the property ever since the house was built in 1939 and the original fence shown in one of the photographs was always at the same place. When Mrs. Lester needed posts for the fence, she got them from the witness.

Mrs. Alice Thelma Howes, a resident of Deale Beach, testified that the eight foot road was built when she moved to Deale Beach in October, 1942. She had been in the vicinity of Mrs. Lester's house, during the 20 years she had lived in Deale Beach, an estimated 100 times. There had never been any other road there other than the eight foot road, and the fence shown in one of the photographs (plaintiff's Exhibit 4) was the only fence that had ever been there.

Mrs. Lester testified that she had constructed the eight foot road in 1939 by using oyster shells, gravel and sand off the beach so that the level of the road was raised up three feet. No one helped her maintain the road. She installed the fence in 1939 all around the lot. She identified various photographs. Since building the house, she had planted flowers in the area around the well. She also testified that the Maucks removed a portion of her fence in the fall of 1962, and erected a new fence. This new fence cut across the eight foot roadway used by her for ingress and egress. She testified that she "could not say that there had been people going up and down when she wasn't there; she didn't know."

There was testimony offered on behalf of the defendants and the intervenor which in part was in conflict with the testimony offered on behalf of the plaintiff, Mrs. Lester.

The Chancellor, without the objection of counsel for the parties, visited the site.

The Chancellor in the decree of June 11, 1965, found that Mrs. Lester had acquired sole title by adverse possession and absolute ownership of the portion of land lying within the boundary of Chesapeake Drive, described by metes and bounds, and shown on plaintiff's Exhibit 3 and the portion of the land on which the well was located, also shown on plaintiff's Exhibit 3. The decree required the Maucks, within 15 days from the entry of the decree, to remove the fence erected by them on the land acquired by Mrs. Lester by adverse possession, including

the portion of the fence blocking the eight foot road. The counter-claim of the intervenor was dismissed and the Maucks required to pay the costs.

Mrs. Lester died on September 1, 1965. Her death was duly suggested to the lower court and her administrator was substituted as a party appellee in this Court by order of April 20, 1967.

The appellants raise four questions: (1) The evidence did not establish adverse possession; (2) There could be no adverse possession in land offered for dedication for public use; (3) The other property owners in the subdivision had acquired rights apart from any public rights; (4) Mrs. Lester was estopped from asserting adverse possession.

We have concluded that the decree of the Chancellor should be affirmed.

(1)

In our recent decision in *Freed v. Cloverlea Citizens Association,* 246 Md. 288, 228 A. 2d 421 (1967), Judge McWilliams, for the Court, carefully reviewed the prior decisions of this Court in regard to obtaining title by adverse possession in a case somewhat similar to the present case. He cited *Blickenstaff v. Bromley,* 243 Md. 164, 171, 220 A. 2d 558, 561 (1966), where we quoted with approval from 3 Am. Jur. 2d, *Adverse Possession,* sec. 14, the following:

> "It is sufficient if the acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as is consistent with the character of the premises in question. The standard to be applied to any particular tract of land is whether the possession comports with the ordinary management of similar lands by their owners, and if so, it furnishes satisfactory evidence of adverse possession."

In *Tamburo v. Miller,* 203 Md. 329, 100 A. 2d 818 (1953), Judge Hammond (now Chief Judge), for the Court, stated:

> "The modern trend and the better rule is that where the visible boundaries have existed for the period set forth in the Statute of Limitations, title will vest in

the adverse possessor where there is evidence of unequivocal acts of ownership. In this view it is immaterial that the holder supposed the visible boundary to be correct or, in other words, the fact that the possession was due to inadvertence, ignorance, or mistake, is entirely immaterial."

Applying these principles to the case at bar, it is clear to us that there was sufficient evidence to support the Chancellor's finding that Mrs. Lester had acquired title by adverse possession. There was evidence from Mrs. Lester and three witnesses that the fence forming a visible boundary had existed for more than the 20 year statutory period, and there was evidence that Mrs. Lester had exercised unequivocal acts of ownership. Her house occupied a small portion of the 25 foot right-of-way as did her well. She had built up the eight foot road and it was her means of ingress and egress to her property for more than the 20 year period. She planted shrubs and flowers in the area around the well. These unequivocal acts of ownership for the prescriptive period are sufficient to vest title by adverse possession in Mrs. Lester.

Although there was evidence which conflicted, in part, with the evidence produced by the defendants and intervenor, the weight of the testimony was for the Chancellor who had the opportunity to judge the credibility of the witnesses. Under the provisions of Maryland Rule 886 a, we should only reverse on the evidence if the lower court, sitting without a jury, was clearly erroneous. It is clear in the present case that we cannot say that the Chancellor's findings of fact were clearly erroneous.

(2)

The appellants maintain that Chesapeake Drive had been offered for dedication to public use and that Mrs. Lester could not obtain title by adverse possession upon land that had been so offered for dedication, prior to "rejection or abandonment of the dedication by the public body."

It is correct that Chesapeake Drive was the subject of an implied offer of dedication to public use. A rule of law, well settled in this State, declares that when an owner of land makes a plat of his property "on which streets or alleys are laid down

and then conveys it in lots as bounding on the streets and alleys by reference to their numbers on the plat from which it appears that they do in fact bound on the streets or alleys, an intention to dedicate the land lying in the bed of the streets and alleys to public use will be presumed, in the absence of language showing that no dedication was intended." *Atlantic Construction Corp. v. Shadburn,* 216 Md. 44, 51, 139 A. 2d 339 (1958); *Hillshire Corp. v. Pachuta,* 235 Md. 178, 201 A. 2d 1 (1964); *Mullan v. Hochman,* 157 Md. 213, 145 Atl. 554 (1929).

Where an implied offer of dedication of this type, or an express offer to dedicate, is accepted by the public, so that the dedication is complete, our decisions have consistently followed the great weight of authority in holding that the dedicated property cannot subsequently be acquired by adverse possession. *Mayor & City Council of Balto. v. Chesapeake Marine Ry. Co.,* 233 Md. 559, 572, 197 A. 2d 821 (1964); *Messersmith v. Mayor & Common Council of Riverdale,* 223 Md. 323, 164 A. 2d 523 (1960); *Town Comm'rs of Centreville v. County Comm'rs of Queen Anne's County,* 199 Md. 652, 87 A. 2d 599 (1952); *Brady v. Mayor & City Council of Balto.,* 130 Md. 506, 101 Atl. 142 (1917); *Cushwa v. Burgess & Comm'rs of Williamsport,* 117 Md. 306, 83 Atl. 389 (1912). The rationale of this rule is, of course, that the public is not to lose its rights in the dedicated property through the negligence or inadvertence of government officials who are agents of the public.

This rationale presents no impediment, however, to the acquisition of property by adverse possession where the public has never accepted the offer of dedication. This is the situation in the case at bar. The right-of-way, abutting Mrs. Lester's land, has, since its creation in 1935, never been accepted by the sovereign body, either expressly or through acts giving rise to an implication of acceptance. In the case of a common law dedication, the public acquires no rights and undertakes no duties in the property offered for public use until a valid acceptance has been made. *Small v. State Roads Comm'n,* 246 Md. 646, 229 A. 2d 408 (1967); *Hillshire Corp. v. Pachuta, supra; United Finance Corp. v. Royal Realty Corp.,* 172 Md. 138, 148, 191 Atl. 81 (1937). And until an acceptance makes the common law dedication complete, the original dedicator or his succes-

sors in interest may revoke or modify the offer to dedicate, in whole or in part.[1] *North Beach v. North Chesapeake Beach Land & Imp. Co.,* 172 Md. 101, 116, 191 Atl. 71 (1937). But see, *Maryland National Capital Park & Planning Comm'n v. McCaw,* 246 Md. 662, 229 A. 2d 584 (1967), involving a statutory dedication.

Applying these principles to the present case, we believe the possession of Mrs. Lester, adverse for more than the statutory period of 20 years, operated both to foreclose the right, title and interest of the original dedicator with respect to the right-of-way and to revoke the offer to dedicate that easement to the use of the general public. The enclosure of the right-of-way and its devotion to private use were clear manifestations of an intention to revoke.

### (3)

The appellant argues, however, that even if Mrs. Lester's adverse possession of the property is said to foreclose the rights of the general public, her possession cannot cut off rights of abutting landowners who purchased their property on the faith of the incomplete dedication.

The appellant is correct in asserting that a dedication, incomplete and revocable against the public, may be final and irrevocable against those purchasing in reliance on the dedication. The distinction and its theory was noted by Judge Horney in *Hillshire v. Pachuta, supra,* a case involving an offer of dedication implied because lots were sold by reference to a plat:

---

1. The right of the dedicator or his successors in interest to revoke an unaccepted offer of dedication has sometimes not been clearly distinguished from the additional requirement, in Maryland, that the offer of dedication, even if not revoked, must be accepted within a reasonable time. See e.g., Hackerman v. Mayor & City Council of Balto., 212 Md. 618, 625-26, 130 A. 2d 732 (1957). For an offer of dedication to be considered to be lapsed, revoked or refused because it was not accepted within a reasonable time, the municipality must have affirmatively intended not to accept or must have allowed the dedicator or his successors to make valuable improvements without objection. See e.g., Whittington v. Comm'rs of Crisfield, 121 Md. 387, 88 Atl. 232 (1913); United Finance Corp. v. Royal Realty Corp., supra. In addition, at common law, an offer of dedication may be revoked by affirmative action of the dedicator or his successors at any time before acceptance.

"[I]t will be presumed that the grant operates as [an offer] of dedication of the street to public use and that the grantor intended to convey to the grantee a complete easement of way in such a street even though the dedication to the public is incomplete. * * *

"The rule affects two classes of persons: the public at large and the lot owners. While both may acquire coextensive rights in a street designated on a plat, *Hawley v. Baltimore,* 33 Md. 270, 280 (1980), there can be no dedication between the owner of land and an individual. *Brady v. Farley,* 193 Md. 255, 259, 66 A. 2d 474 (1949). * * *."

See also *Chapman v. Rogan,* 222 Md. 12, 158 A. 2d 626 (1960) ; *United Finance Corp. v. Royal Realty Corp., supra.*

In our opinion, however, the abutting landowners can derive no advantage from the doctrine of implied easement in this case. All of them purchased their properties after 1939 when Mrs. Lester had bought her lot, built a house and well which extended onto the right-of-way and, as the decree of the lower court necessarily implies, after Mrs. Lester had begun to exercise adverse possession. Under these circumstances, the right of abutting property owners to an easement would now be foreclosed. The open and adverse possession of the right-of-way by Mrs. Lester from 1939 until the removal of her fence by the Maucks forms an effective bar to the assertion of an easement by the other landowners. *Baugh v. Arnold,* 123 Md. 6, 91 Atl. 151 (1914) ; *Canton Co. v. Mayor & City Council of Baltimore,* 106 Md. 69, 93, 67 Atl. 274 (1907) ; Cf. *Ayers v. Hellen,* 235 Md. 258, 261, 201 A. 2d 509 (1964). As we have already indicated, the abutting landowners and their predecessors in title were charged with notice that an adverse claim to the fee (and easement over) the property was being asserted. *Blickenstaff v. Bromley, supra.*

(4)

Finally, the appellants maintain that Mrs. Lester is estopped from closing off any part of the right-of-way because her deed contains certain restrictive covenants running with the land. These covenants are that "all dwellings * * * shall be set back

not less than 20 feet from the side street \* \* \*" and that "no fence \* \* \* shall be built or maintained unless the location \* \* \* be first made known to the grantor in said deed or its successors, and receive its or their approval in writing."

This argument, based on equitable principles, ignores the fact that acts constituting adverse possession are, by definition, "inequitable," since they include the possession of land in defiance of the rights of the legal owners for the prescriptive period. The doctrine is based on the policy that after 20 years, no one can complain of the "inequitable" and indeed, formerly illegal possession. Where, as in this case, the appellee's possession is adverse to the rights of others in both the fee and the easement, restrictive covenants in the adverse possessor's deed, to support the easement, are also barred from enforcement by the running of the prescriptive period, as well as by acquiescence in the violation of the restrictions. *Schlicht v. Wengert,* 178 Md. 629, 635, 15 A. 2d 911 (1940) and cases therein cited. 3 Tiffany, *Real Property,* §871 (1967 Cum. Supp.) ; *McLaughlin v. Neiger,* 286 S. W. 2d 380 (Mo. 1956).

> *Decree affirmed, costs to be paid by the appellants.*